UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAYA DOZIER,
KRICKETT LUCKHARDT, and
MICHELLE MACKAY

        Plaintiffs,

v.

JAMES K. HAVEMAN, in his official
capacity as Director of the Michigan
Department of Community Health; and
MAURA D. CORRIGAN, in her official
Capacity as Director of the Michigan
Department of Human Services

        Defendants.

Case No. 14-12455
Honorable Laurie J. Michelson
Magistrate Judge Michael J. Hluchaniuk

---

**OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [3]**

---

This case arises out of the State of Michigan's winding down of the Plan First! Family Planning Program, a Medicaid program that covered family-planning services, and the ramping up of the Healthy Michigan Plan, a Medicaid program that provides more comprehensive healthcare benefits. Plaintiffs Maya Dozier, Michelle Mackay, and Krickett Luckhardt allege that the Michigan Department of Community Health and the Michigan Department of Human Services ("the Departments") violated federal law by terminating the Plan First! program without first determining whether each Plan First! enrollee was eligible for another Medicaid program such as Healthy Michigan. Plaintiffs further allege that the notices the Departments sent to Plan First! enrollees informing them of the program's termination and its effect on their Medicaid eligibility lacked details required by the Medicaid Act, its implementing regulations, and the Due Process Clause. Plaintiffs believe that the notices should have provided a detailed explanation for

the Plan First! enrollee's ineligibility for other Medicaid programs such as Healthy Michigan. This, Plaintiffs assert, would have allowed the enrollee to make an informed decision about whether to appeal the Departments' Medicaid eligibility determination.

Having granted Plaintiffs' motion for class certification (Dkt. 2), the Court now turns to Plaintiffs' motion for a preliminary injunction (Dkt. 3). The Court finds that Plaintiffs are likely to succeed on their claims that the Department's notice of termination of their Medicaid benefits was inadequate under the relevant provision of the Medicaid Act and implementing regulations and that they are likely to succeed on their claim that the Department was obligated under the Act to conduct an ex parte redetermination of eligibility. Because Plaintiffs are likely to succeed on their claims under the Medicaid statute, the Court does not reach their constitutional claims. The Court also finds that Plaintiffs are likely to suffer irreparable harm if they are denied Medicaid benefits in the absence of the injunction, that the balance of the equities favors injunctive relief, and that an injunction serves the public interest. As such, Plaintiffs' motion for preliminary injunction will be GRANTED as set forth below.

## I.  BACKGROUND

This lawsuit involves the Medicaid Act and related regulations, two Medicaid waiver programs, allegations regarding the phase out of one of those waiver programs, and five named Plaintiffs who purport to represent the class of individuals negatively affected by the phase out. The Court discusses each component in turn.

### A.  Statutory Background

Congress created the Medicaid program in 1965 by adding Title XIX to the Social Security Act "for the purpose of providing federal assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McRae*, 448 U.S. 297, 301

(1980). The program provides assistance to "families with dependent children and of the aged, blind, or disabled individuals" who cannot afford medical care. 42 U.S.C. § 1396-1. The United States Department of Health and Human Services ("HHS") has the authority to promulgate federal regulations to implement the Medicaid statute. 42 U.S.C. § 1302(a). HHS exercises this authority through a unit called the Center for Medicare and Medicaid Services ("CMS"). At the state level, Michigan authorizes its Medicaid program under Michigan Compiled Law § 400.105, which delegates the administration of the program to the Department of Community Health ("DCH") and the Director of DCH. Through an interdepartmental agreement, the Michigan Department of Human Services ("DHS") determines Medicaid eligibility. "Although participation in the [Medicaid] program is voluntary, participating States must comply with certain requirements imposed by the Act and regulations promulgated by the Secretary of Health and Human Services." *Westside Mothers v. Olszewski*, 454 F.3d 532, 535 (6th Cir. 2006). For example, state plans "must provide coverage for the 'categorically needy' and, at the state's option, may also cover the 'medically needy.'" *Pharm. Research and Mfrs. Of Am. v. Walsh*, 538 U.S. 644, 650–51 (2003).

The required "categorically needy" group includes "individuals eligible for cash benefits under the Aid to Families with Dependent Children (AFDC) program, the aged, blind, or disabled individuals who qualify for supplemental security income (SSI) benefits, and other low-income groups such as pregnant women and children entitled to poverty-related coverage." *Walsh*, 538 U.S. at 651 n.4. The optional category of "medically needy" includes "individuals who meet the nonfinancial eligibility requirements for inclusion in one of the groups covered under Medicaid, but whose income or resources exceed the financial eligibility requirements for categorically needy eligibility." *Id.* at 651 n.5.

States may choose to offer coverage to additional populations via a Medicaid waiver program. *See Portland Adventists Medical Ctr. v. Thompson*, 399 F. 3d 1091, 1096 (9th Cir. 2005) ("In the demonstration project statute, Congress expressly tied § 1115 waivers to approved state Medicaid plans . . . . [B]ecause expansion population patients are capable of receiving Title XIX assistance, they must be regarded as 'eligible' for it." (citing *Jewish Hosp., Inc. v. Sec'y of Health & Human Servs.*, 19 F.3d 270, 274 (6th Cir.1994)).

### B. Michigan's Waiver Programs

### 1. Plan First!

Plan First!, the Medicaid waiver program at issue in this case, was geared toward providing family planning services for women ages 19 to 44 who were not pregnant, had income below 185% of the federal poverty level, and who would not otherwise be eligible for Medicaid coverage. (Dkt. 1-6, HHS Approval of Plan First! Waiver [hereinafter Plan First! Approval] at PageID 100.) DCH submitted a waiver request for the program in October 2004, which the Secretary granted on March 1, 2006. (Plan First! Approval at PageID 100, 104.) In order to help Michigan effectuate the program, the Secretary waived the following statutory requirements:

- 1396a(a)(10)(B) [Comparability Requirement];
- 1396a(a)(43) [Early and Periodic Screening, Diagnostic, and Treatment];
- 1396a(a)(34) [Retroactive Coverage];
- 1396a(a)(15) [Prospective Payment System for Federally Qualified Health Centers and Rural Health Clinics].

(Plan First! Approval at 2.) Otherwise, "[a]ll Medicaid requirements appl[ied] . . . ." (*Id.*)

The program was initially authorized for a five-year period, but CMS granted extensions in three month increments starting from April 1, 2011 through June 30, 2013 (Dkt. 18-5, Asman Aff. at ¶ 3.) Finally, DCH obtained a year-long extension to continue coverage through June 30, 2014. (Dkt. 1-7, Plan First! Extension at PageID 114.) Plan First! provided eligible women with

a number of services pertaining to reproductive health and family planning, such as education and counseling, physical examinations, pap smears, contraceptive management, and other necessary medications. (Plan First! Approval at PageID 114.) However, the program did not cover sterilization reversals, infertility treatment, or abortions. (*Id.*)

### 2. Healthy Michigan Plan

The Affordable Care Act ("ACA") amended the Medicaid statute to expand coverage for certain adults under the age of 65, who were not pregnant, with income below 133% of the federal poverty level, and who would not otherwise be entitled to or enrolled in another Medicaid category. 42 U.S.C. § 1396a(a)(10)(i)(VIII). (Compl. ¶ 113.) Michigan implemented this expanded coverage through another waiver program or "alternative benefits package," the Healthy Michigan Plan ("HMP"). Mich. Comp. Laws § 400.105d. Accordingly, the program is available to adults under the age of 65, who are not pregnant, with income below 133% of the federal poverty level, who would not otherwise be entitled to or enrolled in another Medicaid category. 42 U.S.C. § 1396a(a)(10)(i)(VIII). Coverage under HMP is more expansive than Plan First! coverage, and it includes family planning services, meaning "any medically approved means of voluntarily preventing or delaying pregnancy, including diagnostic evaluation, drugs, and supplies. Infertility is not a covered benefit." (Dkt. 1-5, HMP Approval, at PageID 59.)

### C. Plan First! Phaseout

As noted above, Plan First! was scheduled to expire on June 30, 2014; thus, coverage would end on July 1, 2014. DCH declined to seek further extension of Plan First! coverage because of "the expanded coverage available under the ACA, which include[d] family planning services to HMP recipients" and the fact that "the majority of the Plan First! population potentially would be eligible for this more comprehensive health coverage . . . . [and those who

5

would not be eligible for HMP] were required under the ACA's individual mandate to sign up for minimum essential coverage by the end of open enrollment on March 31, 2014." (Dkt. 18, Defs.' Resp. Br. at 4; *see also* Dkt. 18-5, Asman Aff., at ¶ 3.) HMP applications could first be submitted on April 1, 2014 (Asman Aff., at ¶ 6–8.)

Accordingly, DCH submitted a "Phase Out Plan for Plan First! Waiver" to CMS on March 10, 2014. (Defs.' Resp. Br. at 5.) An initial letter informing beneficiaries of the termination of the program, approved by CMS, was mailed to Plan First! enrollees on March 18, 2014. (*Id.* at 6.) CMS approved the phase out plan on April 2, 2014. (*Id.* at 6.) Then, on June 7, 2014, Defendants mailed a notice to certain individuals enrolled in Plan First! advising that coverage under the program was ending and that they had been determined ineligible for Medicaid . It is this phase out procedure that is the subject of the Complaint.

Plaintiffs allege that "Defendants failed to determine [their] Medicaid eligibility under all eligibility categories, including . . . [HMP] before terminating their eligibility for [Plan First!]." (Comp. ¶ 1.) Plaintiffs also allege that Defendants gave them "vague and inconsistent notices dated June 7, 2014, indicating that their Plan First! Medicaid was ending and that they were denied Medicaid after a review of their eligibility for only some, but not all, Medicaid categories." (*Id.* at ¶ 3.) Based on these allegations, Plaintiffs assert the following three counts: Failure to Conduct a Pre-Termination Review (Count I), Failure to Provide Constitutionally Adequate Pre-Termination Notice (Count II), and Failure to Provide a Meaningful Opportunity to be Heard (Count III). Plaintiffs argue that Counts I and III arise from the Medicaid statute and implementing regulations, and seek to enforce them through 42 U.S.C. § 1983. They seek to enforce these rights on behalf of a class consisting of Plan First! recipients who are eligible for Medicaid under other categories, received notice that their benefits would cease without an

evaluation of their eligibility under other categories, and have not been provided with constitutionally adequate pre-termination notice and a meaningful opportunity for a hearing concerning ongoing coverage. (Compl. at ¶ 26.)

Plaintiffs filed the Complaint (Dkt. 5-1), along with motions to certify the class (Dkt. 2) and preliminary injunction (Dkt. 3), on June 23, 2014. On June 30, 2014, this Court issued a stipulated order extending Plan First! coverage pending a ruling on the present motions. The extension applies to "women enrolled on April 1, 2014, and any women who may have been enrolled in Plan First! after April 1, 2014, unless they become ineligible for Plan First! for reasons other than qualifying for comprehensive Medicaid coverage, but excluding those women who are already enrolled in the Healthy Michigan Plan or other comprehensive Medicaid Program." (Dkt. 17 at 1–2.) Defendants were to also provide notice to such women "that their Plan First! Medicaid coverage will continue pursuant to this order." (*Id.*) Over the following months, the parties engaged in extensive settlement discussions. Ultimately, the parties were not able to reach a settlement agreement and so the Motion for Preliminary Injunction is now before the Court.

## II. ANALYSIS

### A. *Burford* Abstention

Defendants ask the Court to decline to exercise its jurisdiction over this dispute pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315, 318, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943). (Defs.' Resp. Br. at 16.) The *Burford* doctrine directs that where "timely and adequate state court review is available," federal courts sitting in equity should decline jurisdiction in two circumstances:

> (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and

> in similar cases would be disruptive of state efforts to establish a coherent policy
> with respect to a matter of substantial public concern.'

*Energy Ass'n v. Public Serv. Comm'n*, 481 F.3d 414, 421 (6th Cir. 2007) (quoting *New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1943)). The Supreme Court has stressed that "abstention from the exercise of federal jurisdiction is the exception, not the rule," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S. Ct. 1236, 47 L. Ed. 483 (1976), and that "the power to dismiss recognized in *Burford* represents an extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996).

The Court finds that *Burford* abstention is unwarranted in this case, not least because Defendants have not presented evidence that this case involves difficult questions of Michigan state law or that there are any current state proceedings, whether in the courts or otherwise, that would be disrupted by an order from this Court. It is true that this case involves Michigan state agencies, the Michigan Medicaid program, and the procedures through which the Michigan state agencies administer Michigan Medicaid benefits. And the Court acknowledges that the resolution of the pending motions may impact the Michigan state budget. But similar considerations have been rejected by courts considering *Burford* abstention.

For example, in *Parents League for Effective Autism Services v. Jones-Kelley*, 565 F. Supp. 2d 905, 908 (S.D. Ohio 2008), plaintiffs sought to temporarily enjoin an Ohio administrative rule that, if implemented, would curtail Medicaid coverage for autism treatment. The state argued that the court should abstain from deciding issues relating to Ohio's Medicaid program due to *Burford* because a court order "could have significant budgetary impacts." *Id.* at 914. The court rejected this argument, noting that other district courts had declined to abstain in

cases involving Medicaid because the claims "were not of an essentially local concern, but involved rather federal funds and federal regulation in an area in which the federal government has taken a keen interest" and because federal Medicaid laws are "routinely interpreted by federal courts and no specialized knowledge of state law is required." *Id.* at 914 (citing *Moore v. Medows*, No. 07-CV-631, 2007 U.S. Dist. LEXIS 47087, at *7 (N.D. Ga. 2007), *rev'd on other grounds*, 324 F. App'x 773 (11th Cir. 2009); *Meachem v. Wing*, 77 F. Supp. 2d 431, 443 (S.D.N.Y. 1999)). As to the budgetary concern, the court noted that

> even though the State may have a substantial interest in the management of its budget, there is no risk of an inconsistent application of state law or policy presented by the case at bar. The regulations which must be interpreted to resolve this matter are federal; the uniformity of application or interpretation of these regulations is a federal concern.

*Id.* (citing *Ohio State Pharmaceutical Ass'n v. Creasy*, 587 F. Supp. 698 (S.D. Ohio 1984)).

Similarly, this case requires the Court to examine the federal Medicaid and constitutional requirements applicable to the winding down of a Medicaid waiver program. These concerns implicate important federal interests, as evidenced by the fact that Medicaid is subject to federal oversight and a regulatory scheme established by the federal government. And the uniformity of interpretation of these regulations is a federal concern. Exercising jurisdiction over this case is therefore appropriate.

**B. Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). This Court must weigh four factors to decide whether to issue a preliminary injunction:

> (1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to

others; and (4) whether the public interest would be served by granting injunctive relief.

*Entm't Prods., Inc. v. Shelby County, Tenn.*, 588 F.3d 372, 377 (6th Cir. 2009); *see also* Fed. R. Civ. P. 65.

**1. Likelihood of Success on the Merits**

<u>Count I</u>

In Count I, Plaintiffs claim that Defendants violated their rights under 42 U.S.C. § 1396a(a)(8) by engaging in a "pattern and practice of terminating Plaintiffs['] Plan First! Medicaid coverage, effective, July 1, 2014, without first determining their eligibility under all other Medicaid categories . . . ." (Compl. at ¶ 144.) Defendants respond that they are not required to conduct pre-termination eligibility reviews where an entire program is ending; that Plaintiffs, as beneficiaries of an optional waiver program, are not entitled to the same pre-termination review as beneficiaries of "comprehensive Medicaid coverage"; and, that Plaintiffs' authorities are factually distinguishable. (Defs.' Resp. Br. at 9–10.) The Court finds that because the Medicaid statute and regulations require a pre-termination review of eligibility, and the case law does not suggest that this requirement is relaxed or eliminated in the context of waiver programs, Plaintiffs have demonstrated a likelihood of succeeding on Count I.

The Court rejects Defendants' assertion that the Medicaid regulations apply differently to Plan First! because it is an optional waiver program rather than a comprehensive or mandatory program. "Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae*, 448 U.S. 297, 301 (1980). And "once a state elects to participate in an optional program, it becomes bound by the regulations which govern it. This includes regulations governing procedures by which a state may terminate programs which it has established." *Eder v. Beal*, 609 F.2d 695, 702

10

(3d Cir. 1979) (citations omitted). These principles also apply to waiver programs. *See Newton-Nations v. Betlach*, 660 F.3d 370, 383 n.5 (9th Cir. 2011) (applying due process requirements under § 1396a to a demonstration project); *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 875-876 (D. Ariz. 2012) (applying free choice of providers provision under § 1396a to a demonstration project); *Susan J. v. Reilly*, 254 F.R.D. 439 (M.D. Ala. 2008) (applying reasonable promptness under § 1396a(a)(8) to a waiver project); *Boulet v. Cellucci*, 107 F. Supp. 2d 61,76 (D. Mass. 2000) (applying reasonable promptness under § 1396a(a)(8) to a waiver project); *McMillan v. McCrimon*, 807 F. Supp. 475, 481–82 (C.D. Ill. 1992) ("The fact that the HSP [a waiver program] is an optional service does not exempt it from the requirements of section 1396a(a)(8).").

To assist states in carrying out waiver programs with specific goals, the Secretary may waive compliance with the requirements of 42 U.S.C. §§ 302, 654, 1202, 1352, 1382, or 1396a to the extent necessary. 42 U.S.C. § 1315(a)(1). This occurred with respect to Plan First!: the Secretary waived compliance with 1396a(a)(10)(B) [Comparability Requirement]; 1396a(a)(43) [Early and Periodic Screening, Diagnostic, and Treatment]; 1396a(a)(34) [Retroactive Coverage]; and 1396a(a)(15) [Prospective Payment System for Federally Qualified Health Centers and Rural Health Clinics]. (Dkt. 1-6, at 2.) But Plaintiffs do not seek to enforce any of these statutory provisions. Rather, they seek to enforce 42 U.S.C. § 1396(a)(3) and § 1396a(a)(8). And the letter from CMS expressly provides that "[a]ll" other Medicaid requirements applied to the program. (*Id.*) Moreover, the Court has found no authority that would render 42 U.S.C. § 1396(a)(3) and § 1396a(a)(8) inapplicable to waiver programs in the absence of a compliance waiver by the Secretary.

Given that § 1396(a)(3) and § 1396a(a)(8) applied to Plan First!, the question becomes whether Defendants complied with those statutory provisions in terminating that waiver program. Section 1396a(a)(8) provides:

> A State plan for medical assistance must[:] provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals;

One of § 1396a(a)(8)'s implementing regulations, 42 C.F.R. § 435.930(b), further provides: "The agency must[:] Continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible." Another, 42 C.F.R. § 435.916(d)(ii)(2), provides: "If the agency has information about anticipated changes in a beneficiary's circumstances that may affect his or her eligibility, it must redetermine eligibility at the appropriate time based on such changes."

The Sixth Circuit interpreted these provisions in *Crippen v. Kheder*, 741 F.2d 102 (6th Cir. 1984). There, a class of mentally handicapped individuals challenged the Michigan Health and Human Services' ("HHS") practice of terminating the Medicaid benefits of those who were no longer "categorically needy" because they had lost social-security benefits. *Id.* at 104. Plaintiffs asserted that this policy violated 42 U.S.C. § 1396a(a)(8) and its implementing regulations at 42 C.F.R. § 435.930(b) and § 435.916(c) (now § 435.916(d)(2)(ii)) because HHS failed to consider whether the individuals were eligible as "medically needy." *Id.* HHS argued that it could not conduct a redetermination of the plaintiffs' eligibility because they had not submitted a written application for Medicaid; instead, as social-security recipients, they had been automatically qualified for Medicaid as categorically needy. *Id.* at 105–106. Thus, HHS argued, "once the department received notice that Crippen was no longer receiving SSI benefits, she was 'found to be ineligible' for [M]edicaid and her benefits could be properly terminated." *Id.* at 106. The Court disagreed with this contention: "an application for SSI serves as an application for

12

[M]edicaid as well . . . ." *Id.* at 106. It further reasoned that the operation of the regulation requiring a written application did not "appear to require Crippen to submit a new application." *Id.* at 106. Having disposed of HHS' claim that they lacked sufficient information to complete a review, the Court turned to § 1396a(a)(8) and its implementing regulations and concluded:

> The regulations require . . . that, upon receipt of notice that an individual has been terminated from the SSI program, the Department must promptly determine ex parte the individual's eligibility for [M]edicaid independent of his eligibility for SSI benefits. While this determination is being made, the state must continue to furnish benefits to such individuals.

*Id.* at 107. The Court acknowledged that HHS' actions did "possess a certain degree of superficial logic," because "[w]here the only basis for a recipient's eligibility for assistance has been eliminated it logically follows that eligibility must cease." *Id.* at 106. But this was not the end of the analysis, for "[t]he regulations at issue . . . provide alternative bases for [M]edicaid eligibility." *Id.* And "[t]he most that was determined by the Department was that one of those bases . . . had been eliminated." *Id.*

More recently, in *Crawley v. Amande*, No. 08-14040, 2009 U.S. Dist. LEXIS 40794 (E.D. Mich. May 14, 2009), DCH officials terminated the plaintiffs from Medicaid because they were no longer categorically needy but did not first determine their eligibility under disability-related categories. Citing 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.930(b), the court found that the "appropriate course of conduct after determining that Plaintiffs were no longer eligible for [Family Independence Program]-related categories was to conduct an automatic review of other Medicaid categories, without the re-application for Medicaid assistance." *Id.* at 63. The court further instructed that "this duty should be afforded to individuals who qualified for Medicaid under *any eligibility category*." *Id.* at *69 (citing *Mass. Ass'n of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983)).

Defendants say that this case is different from *Crippen* and *Crawley* because it does not involve a change in a "beneficiary's circumstances," but instead a program-wide change in circumstances, namely the ending of Plan First!. (*See* Defs.' Resp. Br. at 9–10.) A similar issue arose in *Massachusetts Association of Older Americans v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983). In *Sharp*, an amendment to the Aid to Families with Dependent Children (AFDC) Act required that states include income of stepparents in determining a stepchild's eligibility for AFDC. As a result, certain AFDC families with stepchildren (who had previously been automatically eligible for Medicaid) had their AFDC benefits terminated which resulted in the termination of their Medicaid coverage. *Id.* at 750. Thus, while the beneficiaries' circumstances had not necessarily changed, a change in policy caused their benefits to cease. The First Circuit nonetheless held that Massachusetts needed to redetermine Medicaid eligibility for those in the dependent-child program, explaining that the regulations requiring an *ex parte* determination "apply to individuals who qualified under Medicaid under any eligibility category" and that the reason for the disqualification (amendment to AFDC Act) was "expressly made irrelevant to Medicaid eligibility." *Id.* at 753.

*Sharp's* reasoning is persuasive here. As discussed, nothing in the Plan First! waiver indicates that HHS intended to exclude Plan First! participants from the application of regulations setting forth "requirements for processing applications, determining eligibility, and furnishing Medicaid." 42 C.F.R. § 435.900. Further, individuals qualify for the Healthy Michigan Plan and Plan First! based on similar requirements (low income and ineligibility for other Medicaid programs). There is good reason to think that many, perhaps most, former Plan First! enrollees would be eligible for Healthy Michigan. Thus, as in *Sharp*, the fact that a particular beneficiary's circumstances may not have changed does not render the *ex parte* review

14

requirement inapplicable. In other words, the fact that the entire Plan First! Program is terminating – similar to the AFDC Act amendment – does not excuse the State from redetermining its participants' eligibility for other Medicaid categories.

Defendants also argue that some individuals did not fill out a full Medicaid application but rather an application specific to Plan First! and, thus, some redeterminations will only yield a conclusion that the Defendants need more information from the beneficiary. But that potential result does not render the procedure inapplicable. In similar situations, courts have required the agency terminating benefits to request additional information from potential disenrollees before terminating their coverage. *See Rosen v. Goetz*, 410 F.3d 919, 929 (6th Cir. 2005) ("[Plaintiffs] challenge the State's requirement that potential disenrollees fill out information forms in order to retain eligibility in another Medicaid category. But what else is the state to do?"). Indeed, in *Rosen*, the Sixth Circuit approved a procedure of requesting information, sending an additional request if the form was not returned, and sending a termination notice if there was no response to either request. *Id.*; *see also Crawley*, 2009 U.S. Dist. LEXIS 40794 at *79 ("The Court is cognizant that the determination based on disability, under the usual circumstances, will require additional medical verification. However, the Defendants' obligation to conduct a pretermination review is not limited by the type of application that a recipient initially filed.").

In sum, based on the statute, implementing regulations, and relevant case law, the Court finds that Defendants had a duty to conduct a redetermination of eligibility for individuals enrolled in the Plan First! waiver program before terminating benefits under the program. Although Defendants partially complied with this duty (Dozier's notice, for example, informed her that she would remain eligible for Medicaid with a $395.00 monthly deductible (Dkt. 3-11, Dozier Determination Notice, at 1)), there is no indication that the Departments evaluated all of

the class members for the Healthy Michigan Plan. At the very least, then, Plaintiffs have demonstrated a substantial likelihood of success on their claim that Defendants had a duty to evaluate each Plan First! participant's eligibility for the Healthy Michigan Plan prior to that program's termination.

Counts II and III.

In Counts II and III, Plaintiffs assert that the termination notices they received were inadequate under the Due Process clause of the Fourteenth Amendment and their rights under 42 U.S.C. § 1396a(a)(3). (Compl. at ¶¶ 146, 148.) The Court agrees that the notices were inadequate under the statute and implementing regulations and therefore declines to reach the constitutional question. *See Boatman v. Hammons*, 164 F.3d 286, 289 (6th Cir. 1998); *Crawley*, 2009 U.S. Dist. LEXIS 40794, at *80.

At the outset, the Court emphasizes the difference between a notice that certain Medicaid services will no longer be covered and a notice that a redetermination has been conducted and that an individual's Medicaid benefits are ending as a result of that redetermination. A notice that merely serves to indicate that certain services will no longer be available to *any* Medicaid recipient need not give individualized reasons for the termination of benefits. Thus, for example, in *Benton v. Rhodes*, the Sixth Circuit approved Ohio's procedure of including a card in its monthly mailing to Medicaid recipients that indicated that certain optional services such as private duty nurses and speech therapy would no longer be covered due to budget cuts. 586 F.2d 1, 1 (6th Cir. 1978). The Court held that the notice "adequately advised the recipients of the reasons for the reduction of the optional services, namely, the lack of sufficient funds appropriated by the state legislature." *Id.* at 2.

16

Similarly, in *Wood v. Betlach*, 922 F.Supp. 2d 836 (D. Ariz. 2013), the court considered a notice informing participants of a new rule that would increase co-payments for some Medicaid recipients. The notice explained that "[y]ou will have higher copayments (co-pays) for AHCCCs medical services beginning October 1, 2010 because you are getting AHCCCS services in the AHCCCS Care or Medical Expense Deduction (MED) programs." *Id.* at 852. The notice, the court held, provided "sufficient information for a recipient to know whether he or she can be subjected to the new rule. . . the programs to which the copayments apply . . . the categories of individuals and types of services that are exempt . . . [and] the reason for the action and its statutory basis." *Id.* at 853. The court cautioned plaintiffs that "the notices were not issued to inform recipients of the reasons for their prior coverage determinations, but to inform them of a discrete statutory change in benefits that relates to them as members of one of the two identified AHCCCS programs." *Id.* at 854.

But unlike the notices at issue in *Benton* and *Wood*, the notices that the Defendants sent on June 7, 2014, do not merely inform the recipient that certain Medicaid benefits will no longer be provided. Indeed, Defendants themselves say that the notices "inform the recipient of the intended action–termination of Plan First! benefits. . . . [and] provide the reason for the intended action, *i.e.*, the Plan First! program is ending and your case is being closed or denied *because of lack of eligibility*." (Defs.' Resp. Br. at 14 (emphasis added).)

Where, as here, a notice serves to inform the beneficiary that she has been determined ineligible for benefits, this Court agrees with another in this District that the notice must include "(1) a statement of the actions being taken, (2) reasons for the intended actions, (3) specific regulations that support or require the intended action, and (4) an explanation of the right to a hearing, and under what circumstances Medicaid benefits will continue during the pendency of

17

the requested hearing." *Crawley*, 2009 U.S. Dist. LEXIS 40794 at *75 (citing 42 C.F.R. § 431.210).

The June 7, 2014 notices did not satisfy all four of these requirements. The notices informed recipients that the Plan First! program was ending. (*E.g.* Luckhardt Determination Notice at 1.) They provided some explanation of why the recipient was ineligible for Medicaid; for example, Luckhardt was informed that she was not eligible because she was not "under 21, pregnant, or a caretaker of a minor child in your home" or "over 65 (aged), blind, or disabled." (*Id.*) But the notices did not include any eligibility information on the Healthy Michigan Plan— the very plan that, along with the Affordable Care Act, led the Departments to conclude that Plan First! could be terminated. Indeed, given that enrollees in Plan First! qualified for that program based on income levels below 185% of the federal poverty level, the Departments had every reason to think that many Plan First! enrollees would have also met the Healthy Michigan standard of 133% of the poverty level. Given these facts, the notices failed to provide "a determination on all relevant grounds, thereby undermining any opportunity for a fair hearing." *Crawley*, 2009 U.S. Dist. LEXIS 40794 at *77.

The notice here also falls short of the notice procedures that have been approved in similar situations. *See, e.g., Rosen v. Goetz*, 410 F.3d 919, 924 (6th Cir. 2005) (approving Tennessee's multi-step notice procedure following the elimination of three Medicaid eligibility categories due to a budget shortfall.); *Soskin v. Reinertson*, 353 F.3d 1242, 1258 (10th Cir. 2004) (approving a multi-step, multi-notice procedure following Colorado's elimination of optional Medicaid coverage for legal aliens).

Plaintiffs also say that the notices were misleading regarding their rights to a hearing because, at one point, the notice stated that no hearing was required but, at another, that Plaintiffs

18

had a right to a hearing "if you believe that the decision is wrong." (*E.g.* Luckhardt Determination at 1, 3.) The Court agrees. As noted above, the notices here contained information regarding both the end of a program and an individual eligibility redetermination. Defendants are correct that no hearing is required for an across the board change in a program, *see Benton*, 586 F.2d at 2, but factual issues regarding an individual's eligibility for Medicaid are a different matter. In such a case, § 1396a(a)(3) and its "attendant regulations require the state agency to notify applicants of the right to obtain a hearing and the method of obtaining one when . . . any action is taken which affects the applicant's claim." *Crawley*, 2009 U.S. Dist. LEXIS 40794 at *77.

Plaintiffs have thus established a likelihood of success on the merits that the notice was inadequate under the statute and implementing regulations. The notice did not contain information regarding all eligibility categories (specifically HMP), which was necessary pursuant to 42 C.F.R. § 431.210. Moreover, while this is not central to the Court's holding, Defendants did not request additional information from potential disenrollees before mailing the termination notice that might have allowed them to enroll these individuals in HMP.

### 2.  Irreparable Injury

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (collecting cases). Plaintiffs argue that in the absence of injunctive relief, they will be left without healthcare coverage and therefore be unable to access medically necessary services. (Pl.'s Br. at 17.) For example, former Plan First! enrollees may be unable to afford birth control pills (Luckhardt Decl. at ¶ 12) or pay

for annual gynecological exams (Dozier Decl. at ¶ 13; Mackay Decl. at ¶ 13). The Court finds that Plaintiffs have made a sufficient showing of irreparable injury.

District courts in the Sixth Circuit examining preliminary injunctions in the Medicaid context "have held that delay or denial of Medicaid benefits can amount to irreparable harm." *Markva v. Haveman*, 168 F. Supp. 2d 695, 717 (E.D. Mich. 2001). In *Markva*, for example, the plaintiffs challenged a Medicaid eligibility household income calculation that allowed parent caretakers, but not other relative caretakers, to exclude expenses for a minor resident child. *Id.* at 699. One grandparent caretaker required "blood work associated with her past thyroid cancer" and the other had been diagnosed with hypertension. *Id.* Without Medicaid coverage, the plaintiffs would have been unable to obtain treatment for these conditions. After reviewing case law, the *Markva* court concluded that "denial or delay in benefits which effectively prevents plaintiffs from obtaining needed medical care constitutes irreparable harm. In other words, risk of further injury to health warrants injunctive relief." *Id.* at 719.

In *Crawley v. Amande*, No. 08-14040, 2009 U.S. Dist. LEXIS 40794, at *80–83 (E.D. Mich. May 14, 2009), the court held that plaintiffs whose Medicaid benefits were terminated after their eligibility under the Family Independence Program lapsed had made a sufficient showing of irreparable harm. The court discussed *Goldberg v. Kelly*, 397 U.S. 254, 261, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), stressing the "vital necessity that Medicaid programs provide" and noting that "a controversy over eligibility [for welfare benefits] may deprive an eligible recipient of the very means by which to live while he waits." *Id.* at *81–82 (citing *Goldberg*, 397 U.S. at 261). The court concluded that the "unwarranted lapse in Medicaid coverage has led to severe restrictions in medically necessary healthcare which [plaintiffs] otherwise are unable to afford." *Id.* at 82. Therefore, plaintiffs had demonstrated irreparable harm.

20

In a more recent case, *Wilborn v. Martin*, 965 F. Supp. 2d 834, 847 (M.D. Tenn. 2013), the court granted a preliminary injunction to release plaintiff, a quadriplegic, from a nursing home to in-home care, further directing that plaintiff would be covered by Tennessee's Medicaid program. *Id.* at 836. Forcing plaintiff to remain in the nursing home, the court concluded, would have deprived him of necessary twenty-four hour monitoring. The court concluded that "[t]he loss of necessary Medicaid services constitutes irreparable harm." *Id.* at 847 (collecting cases).

The First Circuit came to the same conclusion in *Massachusetts Ass'n of Older Americans v. Sharp*, 700 F.2d 749 (1st Cir. 1983). As discussed, several plaintiffs had been terminated from the "categorically needy" eligibility category of Medicaid. Those plaintiffs presented affidavits showing that without Medicaid coverage, they had been "financially unable to obtain necessary medical treatment." *Id.* at 753. The court concluded that "[t]ermination of benefits that causes individuals to forego such necessary medical care is clearly irreparable injury." *Id.* (citing *Becker v. Toia*, 439 F. Supp. 324, 336 (S.D.N.Y. 1977); *Bass v. Richardson*, 338 F. Supp. 478, 489 (S.D.N.Y. 1971)).

The foregoing authorities strongly suggest that Plaintiffs would suffer irreparable harm in this case absent preliminary relief. Yet Defendants do not comment on the foregoing authorities. They instead argue that because Plaintiffs have the right to an administrative hearing, they cannot establish irreparable harm. (*See* Def.'s Prelim. Inj. Resp. Br. at 16–17.) A similar argument was presented, and rejected, in *Crawley*, 2009 U.S. Dist. LEXIS 40794, at *83. There, participants had received a notice that they were being terminated from Medicaid due to the lapse of their eligibility under the Family Independence Program. *Id.* at *73. Defendants argued that plaintiffs could not demonstrate irreparable harm because plaintiffs "did not take advantage of the appeals process which would have extended their benefits for the duration of the appeal."

*Id.* at 82. In rejecting this contention, the court explained, "[p]laintiffs cannot be expected to take full advantage of an appeals process where the commencing notice only covers a single basis for Medicaid ineligibility. As such, the Plaintiffs were unaware that they could even bring evidence demonstrating that they qualified for Medicaid under another category. *Id.*

In this case, the Court has already found that the notices distributed to the class did not include any information on the HMP eligibility requirements that might have allowed recipients to exercise their right to a hearing in a meaningful manner. The Court has further concluded that the notices were ambiguous as to whether the recipient even had a right to a hearing. Thus, the existence of a hearing right does not preclude Plaintiffs from demonstrating that irreparable harm is likely in the absence of injunctive relief.[1]

### 3. Balance of the Equities

The Court finds that the third preliminary injunction factor also favors Plaintiffs. The Court acknowledges that the Defendants have expended funds to reinstate Plan First! benefits. Defendants assert that "DHS has already expended more than $500,000 to reinstate Plan First! program benefits" and that if an injunction is granted "it will cost an additional almost $100,000 per week to maintain the program." (Def.'s Prelim. Inj. Resp. Br. at 17.)

But on the record before the Court, it appears that at least some of these expenses can be reimbursed by the federal government. Specifically, 42 C.F.R. § 431.250 provides that federal financial participation is available for "Payments made . . . for services provided within the scope of the Federal Medicaid program and made under a court order." 42 C.F.R. § 431.250(b)(2); *see also Chisholm v. Kliebert*, No. 97-3274, 2013 U.S. Dist. LEXIS 114812, at *36–37 (E.D. La.

---

[1] In addition, Plaintiffs correctly note that they are not required to exhaust their administrative remedies before bringing suit pursuant to § 1983. (Pl.'s Prelim. Inj. Reply Br. at 10 (citing *Patsy v. Bd. of Regents of Fla.*, 457 U.S. 496, 516 (1982); *Heck v. Humphrey*, 512 U.S. 477, 483 (1994)).)

Aug. 13, 2013) (rejecting the Louisiana Department of Health and Human Services' argument that it would have to exert "inordinate amounts of time and resources" to implement a court order requiring it to enroll certain therapists as Medicaid providers and provide certain Medicaid services to a class of individuals diagnosed with autism or Pervasive Developmental Disorders without any guarantee that CMS would approve the changes, because, under 42 C.F.R. § 431.250(b)(2), "LDHH may obtain federal financial participation for ABA services provided to class members without CMS approval by virtue of the Court's order.");

The Court fully appreciates that injunctive relief will place a burden on the state. *Crawley*, 2009 U.S. Dist. LEXIS 40794, at *84. But "[w]hile the problem of additional expense must be kept in mind, it does not justify denying Plaintiffs a right to meaningful notice and continued receipt of Medicaid benefits to which they are entitled pending a final determination" of their eligibility under HMP. *Id.*; *see also Markva*, 168 F. Supp. at 719 ("[T]he Court has found that the defendants' present procedure violates federal law and the defendants must expense the resources necessary to comply with the statutory mandate or risk losing a greater amount of federal funding.").

### 4. Public Interest

A preliminary injunction will also serve the public interest. First, the public interest is served where "individuals who [are] rightfully entitled to Medicaid benefits actually receive[] those benefits without unwarranted interruption or unnecessary delay." *Crawley*, 2009 U.S. Dist. LEXIS 40794, at *88. Indeed, at oral argument, Defendants stated that it was their desire to enroll all of those who are eligible for Healthy Michigan into that program. The injunction in this case will aid Defendants in their long-term goals for the Healthy Michigan Program. This is to say the injunction will require the State to determine whether members of the class are

"deserving of the benefits" offered by HMP, and, if they are, to enroll them in that program. *See Markva*, 168 F. Supp. at 720.

Second, and relatedly, the public interest is served where government agencies follow required procedures for the administration of government assistance. (*See* Pl.'s Prelim. Inj. Reply Br. at 19.) Indeed, Defendants acknowledge that "[t]he public and the Departments share an interest in the orderly administration of public benefits." (Def.'s Prelim. Inj. Resp. Br. at 17.) And in this case, Congress and the Department of Health and Human Services have provided guidance on how the Defendants are to perform such administration. The injunction will aid Defendants in complying with these directives.

## III. CONCLUSION

Plaintiffs have shown that they are likely to succeed on the merits of their claims under the Medicaid statute and its implementing regulations. They have demonstrated that, absent an injunction, class members are likely to suffer irreparable injury. The balance of the equities also tips in favor of Plaintiffs. And an injunction will serve the public interest. All four preliminary injunction factors thus favor awarding Plaintiffs and the class they represent preliminary relief.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction is **GRANTED.**

It is HEREBY ORDERED that Defendants James K. Haveman and Maura D. Corrigan, their agents, and those acting in concert with Defendants, are PRELIMINARILY ENJOINED from terminating any class member's Plan First! benefits until the Department of Community Health and/or the Department of Health and Human Services ("the Departments") provide each class member notice of their Medicaid eligibility under 42 U.S.C. § 1396a(a)(3) and its implementing regulations, 42 C.F.R. §§ 431.210–214, as those provisions have been interpreted

24

in this opinion. The notice must (1) explain to the class member that the Plan First! program ended on June 30, 2014 and benefits under that program have only been temporarily restored via this litigation and will expire when the class member is placed in a new Medicaid eligibility category, is determined ineligible for any other Medicaid eligibility category, or this injunction is lifted (2) inform the member that the Departments have performed an ex parte review of the member's eligibility for the Healthy Michigan Plan based on all information reasonably available to the Departments, (3) provide a member-specific reason (e.g., Modified Adjusted Gross Income too high) for why the member was not found eligible for Healthy Michigan or else state that the member is eligible for Healthy Michigan, and (4) unambiguously state that the member has a right to challenge the eligibility determination through an administrative process which includes the right to an administrative hearing. To satisfy these notice requirements, the Departments must perform an ex parte review of the member's eligibility for the Healthy Michigan program based on all information reasonably available to or reasonably requested by the Departments. If the Departments do not possess sufficient information to perform such a review, they must submit at least one written request to the individual member requesting the necessary information.

**IT IS SO ORDERED.**


s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE


Dated:  October 29, 2014

25

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on October 29, 2014.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson